OPINION OF THE COURT
John R. LaCava, J.
The trial of this RPTL article 4 proceeding, challenging the denial by the Town of Mount Pleasant of the real property tax exemption sought by petitioner Legion of Christ, Inc. (Legion NY) for the tax assessment years 1999 through and including 2006,[1] for the premises designated on the town tax map as section 112.12, block 1, lot 1, and known alternately as and located at 500 and 590 Columbus Avenue, Thornwood, Town of Mount Pleasant, New York (the parcel or subject property), took place before the court on May 12 and 13, 2008.
The subject property is part of a larger parcel which was formerly owned by International Business Machines Corporation (IBM). It included a conference center, an office building, and an undeveloped parcel encompassing over 267 acres of land. IBM sold the entire parcel to petitioner in 1996,[2] who, itself and through other affiliated organizations, then began to make use of the various facilities thereon, as well as conducting long-term planning for eventual uses of other portions of the parcel.[3]
Prior to June 1, 1999, the taxable status date for the 1999 petition, Legion NY duly filed applications with respondent Town for a total exemption from property taxes on the subject premises pursuant to RPTL 420-a. In each year up to and including the final tax assessment year at issue, 2006, the Town denied applications for such exemptions. Although granted for 2007, it was again denied in 2008 and another petition, challenging the denial, was timely filed.
*708 As stated above, the matter was tried before the court on May-12 and 13, 2008. The only witnesses to testify were called by petitioner, namely, James J. Timmings, respondent Assessor, and Father Jose Felix Ortega, LC, a principal in several of the associated corporations involved. Based upon the credible evidence adduced at the trial, the court makes the following findings of fact and conclusions of law.
Findings of Fact
Petitioner first called respondent Assessor James J. Timmings. Timmings testified that denial of Legion NY’s applications for tax exemption for tax assessment years 1999 through 2006 was based solely on other pending litigation between Legion NY and respondent Town (the zoning case). According to Timmings, he never reviewed the lease arrangements for the subject parcel, or the rent received thereunder, in making his separate determinations to deny the exemption petitions for the subject parcel in the tax assessment years in question; rather, so long as the zoning case was pending, he reflexively denied Legion NY’s exemption applications.'* **[4] When the zoning case was finally resolved in favor of Legion NY (as set forth above), Timmings in turn simply granted the exemption for tax assessment year 2007, based solely on the final resolution of the zoning case in favor of Legion NY. Timmings asserted, however, that the grant of the exemption was “a mistake,” which he corrected by denying the exemption for tax assessment year 2008.
Petitioner next called Father Jose Felix Ortega, a priest ordained into the Legionaries of Christ (LC or Legionaries), a recognized religious order of the Roman Catholic Church. Father Ortega testified that he has been a financial and/or administrative director of several religious corporations run by and affiliated with the Legionaries, and also located at the subject premises. According to Father Ortega, petitioner is a not-for-profit religious corporation incorporated in 1978 by the Legionaries pursuant to N-PCL article 1 to further the order’s activities. Legion NY is also recognized, pursuant to Internal Revenue Code (IRC) (26 USC) § 501 (c) (3), as set forth below, *709 as a nonprofit corporation.[5]
[6] Legion NY is governed by a board of directors consisting of priests, including Father Ortega, of the LC order. Father Ortega is also the treasurer and secretary of Legion NY. The primary office for Legion NY is housed in the conference center, which is adjacent to the subject property.
The court also finds that Alpha Omega Family Center, Inc. is also a not-for-profit religious corporation organized, pursuant to N-PCL article 1, to further LC’s activities, particularly its educational activities. Alpha Omega was incorporated in 1993 by LC, and is similarly recognized pursuant to IRC § 501 (c) (3) as a nonprofit corporation. Alpha Omega is similarly governed by a board of directors consisting of LC priests, including Father Ortega. Father Ortega is also the treasurer and secretary of Alpha Omega, which also has its primary office in the conference center.
The court also finds, as Father Ortega fu'rther stated, that Consolidated Catholic Administrative Services, Inc. (CCAS) is also a not-for-profit religious corporation pursuant to N-PCL article 1, established to further the Legionaries’ activities, particularly in the administration of LC and its organizations. It was incorporated in 1999 by LC, and is similarly recognized pursuant to IRC § 501 (c) (3) as a nonprofit corporation. The corporation is led by a board of directors made up of ordained LC priests and brothers, and has its primary office at the subject property.
The court credits Father Ortega’s testimony that the Legion of Christ, Inc., a Connecticut nonstock corporation (Legion CT) is a not-for-profit religious corporation incorporated in 1971 by LC pursuant to Connecticut law, to further LC’s activities, in particular its fund-raising activities, and it is also recognized, pursuant to IRC § 501 (c) (3), as a nonprofit corporation. The corporation is led by a board of directors, consisting of LC priests and/or brothers, which formerly included Father Ortega; Father Ortega was also formerly an officer of Legion CT. The primary office for Legion CT is at 393 Derby Avenue, Orange, Connecticut.
While all of the corporations are legally distinct entities, they are financially interdependent with one another and with LC. They often share corporate directors and officers, who are all ei *710 ther priests or brothers of LC; these corporate officers and directors are bound, by their vow of obedience to their LC superiors, to carry out such directives as are given to them within the religious hierarchy of LC. Finally, these corporate entities all work exclusively in pursuit of the same religious and educational mission as that which is determined, pursued, and dictated by LC. The court accordingly finds that, specifically for tax purposes, all of the above-related organizations are wholly-owned subsidiaries of LC.
The court also finds, based on Father Ortega’s testimony, that Legion NY and Legion CT are cosigners of the bank note for the subject property; that Legion CT has made, pursuant to that obligation, payments on the note beginning at the time of sale and, therefore, before the initiation of the leases and subleases involved herein; and that, also commencing prior to the same leases and subleases, Legion CT has periodically made transfers of money to Legion NY (and other LC organizations) in order to further LC operations.
The court further finds that, beginning in 1996, after the purchase by Legion NY of the entire complex from IBM, Alpha Omega entered into a triple-net lease of the subject property with Legion NY, with a rental amount of $120 per year for 10 years. The uses which were permitted on the premises were those related to LC’s training and education mission. In August 2002 the lease was amended, extending the term to 2010, and in 2004 it was also amended to reduce the rent for a portion of the term to $100.
The court further finds that, in September 2002, Alpha Omega entered into a sublease of a portion of the subject property with CCAS, with a rental amount of $12 per year for a term of eight years, with CCAS’s activities limited to those Catholic administrative, religious, and educational uses approved by Alpha Omega. In February 2003, Alpha Omega also entered into a sublease of another portion of the subject property with Legion CT, with a rental amount of $12 per year for a term of seven years, with activities similarly limited to those Catholic administrative, religious, and educational uses approved by Alpha Omega. The administrative offices of LC’s Provincial also moved into the wing in which those of Legion CT were located at this time. Father Ortega added that, during the lease term, and currently, and in furtherance of LC’s nonprofit mission as an order of the Roman Catholic Church, Alpha Omega has maintained storage and administrative offices in the *711 premises; CCAS has storage space, administrative offices, and meeting and educational rooms in the right wing of the premises; and Legion CT has offices, and meeting rooms and classrooms, in the left wing there. No other entities lease space at the premises.
The court also finds that Father Ortega, who has graduate degrees in both accounting and finance, prepared a financial analysis of the income and expenses related to the leases of the property by Legion NY to Alpha Omega, and Alpha Omega to CCAS and Legion CT.[6] Legion NY chose to adopt a straight-line 30-year amortization method for the subject parcel for tax purposes, which method is a conservative depreciation method under the generally accepted accounting principles in these circumstances. The amount of depreciation expense is thus the same in each of the tax assessment years in question in this proceeding, namely, $119,402.94 per year.
The annual mortgage expense, according to Father Ortega, varied, based on the variable interest rate, between just over $143,000 and $255,000. As co-obligor on the mortgage note, Legion CT has paid these mortgage expenses since the purchase of the property. Nevertheless, since Legion NY is not only a coobligor, but also administratively responsible for the property, Legion NY also makes an accounting entry in its books which adopts the mortgage payments as an expense.
Additionally, there were maintenance charges associated with the property, which charges, under the leases, were assumed by the sublessees, CCAS and Legion CT. These included water, gas, and electric; insurance; elevator and alarm maintenance; and janitorial and cleaning supplies. These expenses, in total, varied between slightly more than $15,000 per lease, per year, and just over $75,000 per lease, per year.[7] These expenses were paid directly by the sublessees (CCAS and Legion CT) to the parties supplying the services and/or the materials.
*712 The court thus finds that for the tax assessment years in question the amount of rent paid by Alpha Omega, CCAS and Legion CT for the use of the subject premises, which varied between $12 and $120 per year, per lease, was far exceeded by the mortgage, maintenance, and depreciation charges for the premises, which ranged between $15,000 and $75,000 per lease, per year.
Conclusions of Law
The court makes the following conclusions of law:
The Burden of Proof
Religious corporations incorporated under section 402 of the N-PCL are organizations eligible for tax exemption. (Cf. Walz v Tax Commn. of City of N.Y., 24 NY2d 30 [1969]). It appears undisputed that Legion NY, Alpha Omega, CCAS, and Legion CT, as corporations founded by a recognized religious order of the Roman Catholic Church, are such corporations, and that, in addition, they are all similarly recognized by the Internal Revenue Service (IRS) as not-for-profit religious corporations by their IRC § 501 (c) (3) designation via the 1946 (and subsequent) letter rulings. In any event, in both of the aforementioned cases relating to these same parties (the prior RPTL article 7 case and the zoning case), this court, and the Court of Appeals, found that the petitioner is such an organization.
This court has frequently held that the burden of proof lies with a petitioner who seeks an initial property tax exemption. (See Legion of Christ v Town of Mount Pleasant, supra, Sup Ct, Westchester County, July 10, 2007, LaCava, J.; see also People ex rel. Watchtower Bible & Tract Socy. v Haring, 8 NY2d 350 [1960].) Thus, here, the burden of proof is on Legion NY to establish entitlement to treatment as an exempt institution.
The Religious Exemption
RPTL 420-a (1) (a) provides:
“1. (a) Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, or moral or mental improvement of men, women or children purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation *713 or association as hereinafter provided shall be exempt from taxation as provided in this section.”
Additionally, RPTL 420-a (2) provides:
“2. If any portion of such real property is not so used exclusively to carry out thereupon one or more of such purposes but is leased or otherwise used for other purposes, such portion shall be subject to taxation and the remaining portion only shall be exempt; provided, however, that such real property shall be fully exempt from taxation although it or a portion thereof is used (a) for purposes which are exempt pursuant to this section or sections four hundred twenty-b, four hundred twenty-two, four hundred twenty-four, four hundred twenty-six, four hundred twenty-eight, four hundred thirty or four hundred fifty of this chapter by another corporation which owns real property exempt from taxation pursuant to such sections or whose real property if it owned any would be exempt from taxation pursuant to such sections, (b) for purposes which are exempt pursuant to section four hundred six or section four hundred eight of this chapter by a corporation which owns real property exempt from taxation pursuant to such section or if it owned any would be exempt from taxation pursuant to such section, (c) for purposes which are exempt pursuant to section four hundred sixteen of this chapter by an organization which owns real property exempt from taxation pursuant to such section or whose real property if it owned any would be exempt from taxation pursuant to such section or (d) for purposes relating to civil defense pursuant to the New York state defense emergency act, including but not limited to activities in preparation for anticipated attack, during attack, or following attack or false warning thereof, or in connection with drill or test ordered or directed by civil defense authorities; and provided further that such real property shall be exempt from taxation only so long as it or a portion thereof, as the case may be, is devoted to such exempt purposes and so long as any moneys paid for such use do not exceed the amount of the carrying, maintenance and depreciation charges of the property or portion thereof, as the case may be.”
*714 Ownership by the Religious Organization
The court finds that Legion NY has established by a fair preponderance of the evidence that the subject premises were owned by the religious corporation, namely, Legion NY, during the tax assessment years in question.
Exclusive Use for Religious Purposes
The court further finds that, during the tax assessment years in question, all of the religious corporations involved herein, Legion NY, Alpha Omega, CCAS, and Legion CT, used the premises exclusively for religious purposes.
Exemption under RPTL 420-a (1)
Besides ownership of the property by a religious organization, in order to demonstrate eligibility for the religious exemption under RPTL 420-a (1), petitioner must show that the owning corporation exclusively used the premises for carrying out thereupon its religious purpose. As mentioned previously, in a letter ruling dated March 25, 1946, the IRS held that all agencies and instrumentalities, and all educational, charitable, and religious institutions, of the Roman Catholic Church in the United States are entitled to exemptions pursuant to IRC § 501 (c) (3), so long as they appear in the Official Catholic Directory, an official listing of Roman Catholic organizations in the United States compiled and published annually by the Church. The IRS, as a matter of course, reissues this ruling annually. The institutions named herein have all appeared in the Directory since about the time of their incorporation, and thus during the tax assessment years in question, are all considered institutions which are part of the Roman Catholic Church, and thus entitled to the Church’s tax exempt status.
Indeed, as the ruling makes clear, for federal tax purposes, institutions and organizations of the Catholic Church, whether incorporated or not, are considered to be tax exempt. Further, it is clear that each of the corporations herein is both a subsidiary of, and a related company to, the Roman Catholic Church in the United States as a whole, but, in particular, to LC. As set forth above, all of the directors and officers of Legion NY, Alpha Omega, CCAS, and Legion CT, are priests or brothers of LC. Father Ortega was clear that the actions of each corporation are interdependent, and operated for the purposes, and benefit, of LC. Indeed, the unchallenged testimony by Father Ortega is that the vow of obedience entered into by the LC priests and *715 brothers serving as officers and directors of these corporations dictates that, at all times, they remain primarily responsive to the interests of LC in their operation of the several corporations’ business affairs. The court thus finds that they are related organizations, at least insofar as the Tax Law is concerned. (Cf. Tax Law § 210 and IRC § 1563 [“controlled group”]; Matter of Gropper v Tax Appeals Trib. of State of N.Y., 9 AD3d 796 [3d Dept 2004].)
Further, all of the corporations but one were founded by LC before the first lease at issue here even took place (Legion CT’s incorporation even predating Legion NY’s founding by seven years), and each incorporation occurred well before that corporation’s leasehold at the subject premises began. In addition, the aforementioned interdependent relationship preceded by many years the leaseholds at issue. The evidence clearly demonstrates that Legion CT paid the mortgage on the subject premises for in excess of six years before taking possession as a sublessor.[8]
Respondents point to Sisters of St. Joseph v City of New York (49 NY2d 429 [1980]), and argue that only RPTL 420-a (2) is applicable here, since the subject property was leased to other corporations. Petitioner, however, persuasively argues that, notwithstanding Sisters of St. Joseph, the court may consider both RPTL 420-a (2) and (1), since the LC entities are not unrelated, but rather related, religious corporations.
Certainly, Sisters of St. Joseph ostensibly appears similar to our case. It did entail the interaction of several Roman Catholic corporations which were, in that case, located in the Diocese of Brooklyn. However, upon closer examination, the three corporations involved in Sisters of St. Joseph were completely unrelated to each other. In the first instance, there was the named party owner and lessor, the Sisters of St. Joseph, an unincorporated order of nuns in the Roman Catholic Church headquartered outside of Brooklyn and independent of the Brooklyn Diocese. The next entity involved in the case was the lessee/sublessor, Catholic Charities of Brooklyn, a charitable corporation operated indirectly by the Brooklyn Catholic Diocese. The final *716 involved party was the sublessee, a private, not-for-profit corporation which functioned independently and entirely separately from the Brooklyn Diocese.
Now, let’s contrast with the above the circumstances of the instant case. The owner of the premises at issue is Legion NY, a religious corporation founded and operated wholly by LC, and headquartered on the subject parcel. The second party herein, the lessee/sublessor, is a religious corporation likewise founded and operated wholly by LC, and likewise headquartered on the subject parcel. The third entity, the first sublessee, is also a religious corporation founded and operated wholly by LC, and also headquartered on the subject parcel. The final party, sublessee Legion CT, is likewise a religious corporation founded and operated wholly by LC, which, though headquartered in Connecticut, is administered from offices on the subject parcel.
Notably, the Court in Sisters of St. Joseph looked to the relationship between the involved organizations to determine whether or not RPTL 420-a (2) was implicated. As the Court noted,
“Moreover, even without the benefit of this legislative history, we would construe the very language of [then] subdivision 2 of section 421 of the Real Property Tax Law as being specifically applicable where one tax-exempt organization leases its property to another. This section begins with the following language: ‘If any portion of such real property is not so used exclusively [by the owner-organization] to carry out thereupon one or more of such [tax-exempt] purposes but is leased or otherwise used for other purposes, such portion shall be subject to taxation and the remaining portion only shall be exempt.” (49 NY2d at 440 [emphasis added].)
The court also notes that Matter of Pace Coll. v Boyland (4 NY2d 528 [1958]) is not inapposite. There, Pace College had contracted out operation of its student cafeteria to a commercial food service. The Court held that
“[h]ere the cafeteria is not used as a source of income and the equipment which the college owns is put to its own use. This cafeteria is part of the operation of Pace College. Furnishing of meals to students, faculty and staff on college premises is recognized as entering into their use for educational purposes, nor does it customarily disturb full tax exemption ....
*717 “The reason on account of which part of appellant’s tax exemption has been withdrawn is not that it conducts a cafeteria, but that it does so through Horn & Hardart. We think that Pace College is not the less operating this cafeteria for its own educational purposes within the meaning of the Tax Law for the reason that it is done by a means of a commercial restaurant operator, than was the case when the college farmed out this operation to a professional caterer at a commission of 2% on gross sales of food. This is not renting space to some disassociated enterprise, it is part of the conventional operation of a private school, college, hospital or other benevolent institution.” (4 NY2d at 532-533.)
Here, LC’s apportionment of the various administrative aspects of the operation of the order’s business, conducted through Alpha Omega, CCAS, and Legion CT, is no less intrinsic to LC’s religious mission than was Horn & Hardart’s operation of a student cafeteria integral to Pace’s educational mission.
From Father Ortega’s testimony, it is obvious that the true owner of the subject property is the order itself, LC. Even if LC is not deemed the true owner of the subject parcel, however, based on the demonstrated interrelationship of all of the corporate lessors, lessees, and sublessees involved here, namely, Legion NY, Alpha Omega, CCAS, and Legion CT, to LC, the court concludes that Legion NY, the named owner, has simply not leased the premises to another tax-exempt organization within the contemplation of RPTL 420-a (1) and Sisters of St. Joseph. Rather, real property owned by an organization (Legion NY) was exclusively used by the same organization (albeit through several related organizations) for carrying out thereupon its religious purpose. Therefore, under RPTL 420-a (1), an exemption should have been granted to Legion NY.
Exemption under RPTL 420-a (2)
In any event, even if the associated corporations present herein are not deemed a single organization under Sisters of St. Joseph, and therefore Legion NY is not entitled to an exemption pursuant to RPTL 420-a (1), as set forth above, RPTL 420-a (2) also provides for an exemption from property taxes under certain conditions:
1. Where a portion of real property is not used exclusively to carry out religious purposes on the premises, but is leased and used for religious purposes by the lessee;
*718 2. The lessee using the premises for a religious purpose is another tax-exempt corporation; and
3. The amount paid for the use by the lessee does not exceed the amount of the carrying, maintenance and depreciation charges of the property.
Here, it is not seriously contested that the property is being leased by Legion NY to Alpha Omega, and subleased by Alpha Omega to CCAS and Legion CT, that all are tax-exempt religious corporations, or that the premises are being used solely for religious purposes. Rather, the Town asserts that the amount paid by Alpha Omega, CCAS, and, in particular, Legion CT, to Legion NY, exceeds (indeed, far exceeds) the amount of the carrying, maintenance, and depreciation charges on the property.
As set forth in greater detail above, the court has found that the amount of rent paid by Alpha Omega, CCAS and Legion CT for the use of the subject premises varied between $12 and $120 per year in each of the several leases, and that these amounts did not exceed the carrying, maintenance and depreciation charges on the property. In fact, these rental amounts were far exceeded by the mortgage, maintenance, and depreciation charges for the premises, which ranged from $15,000 per lease, per year, up to $75,000 per lease, per year, for the years in question.
Respondents have urged this court to find as a matter of law that the mortgage payments made by Legion CT to the several banks holding the mortgages and notes on the premises should be attributable to its rental obligation to Legion NY. However, as the court has already noted, Legion CT is a co-obligor on those notes, and therefore, none of the payments went to Legion NY or Alpha Omega, but instead directly to the associated banks. Additionally, the original obligation was entered into long before Legion CT ever commenced its lease of the premises, and the payments were apparently made at the direction, not of Legion NY as a condition of or in some other way associated with the leasehold, but of the LC order itself.
Further, RPTL 420-a (2) specifies that such moneys as are “paid for such use” (of the premises) shall not exceed the mortgage, maintenance, and depreciation charges for the premises. The court, again, as set forth above, has found that the sole amounts paid for the use of the premises were the rental amounts due and owing from the lessee and sublessees under the leases, namely, the rents of $12 and $120/$100 paid to the lessor/sublessor each year. Such other amounts as were paid, again, consisting primarily of payments on the outstanding *719 mortgages, were made in respect to Legion CT’s obligation as co-obligor on those mortgages, commencing well prior to the leaseholds, and not as a result of the leaseholds, or for the use of the premises.
The court thus holds that the amount paid by the lessee and sublessees for the use of the property did not exceed, in any of the years at issue, the amount of the carrying, maintenance and depreciation charges on the property. Petitioner is therefore also entitled to an exemption pursuant to RPTL 420-a (2) for the tax assessment years 1999 through and including 2006.
Conclusion
Due to the interrelated nature of all of the religious organizations involved here, namely, Legion NY, Alpha Omega, CCAS, and Legion CT, to the Roman Catholic religious order, the Legionaries of Christ, Legion NY, through those other corporations, used the subject premises in order to carry out therein LC’s religious purpose. Alternatively, while these various religious entities may be deemed to be separate corporations, the amounts paid by the corporate lessee and sublessees for the religious use of the premises (at the direction of LC) did not exceed the amount of the carrying, maintenance and depreciation charges incurred by Legion NY (and LC) on the property. Therefore, petitioner Legion of Christ, Inc. has demonstrated by a fair preponderance of the evidence that it was entitled to an exemption pursuant to both RPTL 420-a (1) and (2) for the taxable status years 1999 through and including 2006.
Upon the foregoing papers, and the trial held before this court on May 12 and 13, 2008, it is hereby ordered, that the petitions by petitioner for orders granting its petition seeking the grant of a religious exemption pursuant to RPTL 420-a, is hereby granted; and it is further ordered that respondent Town shall grant the tax exemption sought by petitioner pursuant to RPTL 420-a for the parcel designated on the Town tax map as section 112.12, block 1, lot 1, and known alternately as and located at 500 and 590 Columbus Avenue, Thornwood, Town of Mount Pleasant, New York, for the tax assessment years at issue in the instant petition, namely, 1999 through and including 2006; and it is further ordered, that the assessment rolls are to be corrected accordingly, and overpayments of taxes, if any, are to be refunded with interest.

. While a petition challenging the 2008 tax year assessment on the same grounds is apparently now pending, it was not consolidated for trial with the instant matter and remains open.

. The subject property (also called the office building parcel or building 2) was created by the Town in 1999 by carving it out of an already existing tax parcel, now known separately as the conference center parcel.

. (See Legion of Christ, Inc. v Town of Mount Pleasant, Sup Ct, Westchester County, July 10, 2007, LaCava, J. [the prior RPTL article 7 case]; see also Town of Mount Pleasant v Legion of Christ, Inc., 21 AD3d 368 [2d Dept 2005], mod 7 NY3d 122 [2006] [the zoning case, relating to the conference center parcel].)

. The court notes that, had these petitions been brought pursuant to CPLR article 78, in the face of such an admission by the Assessor, the court would have been inclined to remand the matter to the Town for an actual determination on the merits. As the petitions are in the form of an RPTL article 4 challenge to the Assessor’s determination, however, the court instead chose to proceed with a trial de novo.

. As set forth in greater detail below, all of the corporations involved herein are covered by the 1946 United States Internal Revenue Service letter ruling relating to institutions and organizations of the Roman Catholic Church in the United States (the letter ruling).

. The financial chart (petitioner’s 44), was created using an allocation of expenses for the entire parcel (the office building, the conference center, and the unimproved parcel) to the office building, based on the ratio of square footage in the latter to the former.

. Father Ortega testified that he was unable to find many of the expenses for tax assessment years 1999 through 2001, and that, even in 2002 and after, he was unable to compile all of the expenses for those years. Between 2002 and 2006, however, having compiled most of the maintenance expenses for the property, Father Ortega was able to say that the expenses generally were between just over $15,000 per lease, per year, and just over $75,000 per lease, per year.

. The simple fact that the several corporations predated the leases (and even the purchase itself) by many years, and that Legion CT had paid the mortgage on the property for many years prior to even entering into a lease of the premises, makes respondents’ argument that the rent relationship was somehow an attempt at structuring to insure a property tax exemption particularly strained.